144 P.3d 331 (2006)
Lynn A. SMITH, in her individual capacity, and as Guardian for M.S., a minor, Appellants,
v.
STATE of Washington, Shirley Gantzer, Lois Chowen, Marilyn Akiyama, Respondents.
No. 55388-7-I.
Court of Appeals of Washington, Division 1.
September 18, 2006.
*333 Steven Clifford Gish, Attorney at Law, Port Angeles, WA, for Appellants.
Peter John Helmberger, Attorney General Office, Torts Division, Olympia, WA, for Respondents.
*334 GROSSE, J.
¶ 1 A duty of care may arise where a public official charged with the responsibility to provide accurate information fails to correctly answer a specific inquiry from a plaintiff intended to benefit from the dissemination of the information. Here, in response to a specific inquiry, officials from the Department of Social and Health Services allegedly conveyed to Lynn Smith inaccurate information about Lynn Smith's appeal rights regarding her application for adoption assistance benefits, information she allegedly relied on to her and her infant child's detriment. Because the Smiths have established a prima facie case for negligence under the special relationship exception to the public duty doctrine, we reverse the trial court's summary judgment order.

FACTS
¶ 2 Lynn Smith adopted 6-month-old M.S. in January 1998. Over the next year, M.S. began exhibiting symptoms of attachment disorder. When M.S. was 18 months old, a doctor concluded that M.S.'s behaviors of uncontrollable crying, lack of response to comforting, lack of apparent bonds to objects and people, poorly regulated affect, difficulty sleeping, and physical aggression were signs of early attachment disorder. The doctor also found 18-month-old M.S. had the communication skills of an 8-month-old and the socialization skills of a 7-month-old, that M.S. would continue to be a child with special needs, and her mother would need help and support from a professional for much of M.S.'s preschool years and periodic monitoring after that time. The doctor recommended that Smith apply for adoption assistance so that the adoptive placement was successful.
¶ 3 At the age of almost two, M.S. was again tested by an early childhood specialist who found M.S. had the socialization skills of an 11-month-old. The specialist concluded that M.S.'s delay in socialization skills put her at significant risk for educational failure and noted her unprovoked attacks on other children and caregivers.
¶ 4 On January 21, 1999, after learning of the seriousness of M.S.'s diagnosis, Smith applied to the Department of Social and Health Services (DSHS) for federal adoption assistance, including therapy and counseling for the child and parent, training for the family, therapeutic child care, and respite care. In spite of repeated requests for a decision both from the adoptive mother and from the early childhood specialist working with M.S., no decision was made on the application for seven months after the application. On July 21, 1999, on the advice of the federal Department of Health and Human Services (DHHS) Northwest Child Welfare Adoption Specialist, Smith filed a complaint with Constituent Relations regarding the lack of any decision on her application for adoption assistance.
¶ 5 On August 25, 1999, the regional program manager for the Adoption Support Services of DSHS sent a denial letter to Smith stating as reasons for the denial:
a. Federal Rule 45 CFR 1356.40(b)(1) which states that the adoption assistance agreement must "be signed and in effect at the time of or prior to the final decree of adoption";
b. Department of Health and Human Services, Administration for Children, Youth and Families' Policy Interpretation Questionnaires (PIQ's 88-06 and 92-02) which provide guidelines for a finding of extenuating circumstances. Based on the history of the case, I believe there is no basis for a finding of extenuating circumstances.
The letter then advised Smith of her right to a hearing on the denial. No further reasons were given for the denial of the application.
¶ 6 Smith asked Shirley Gantzer (the regional program manager), Lois Chowen (the Program Manager), and Marilyn Akiyama (a program supervisor) for any further reasons for the denial of the application for adoption assistance for M.S. No one gave any further reasons for denial. Smith requested a fair hearing on the denial.
¶ 7 On August 30, 1999, Smith wrote another letter to Constituent Relations, pointing out that federal hearing regulations require that reasons for denial be given. *335 When Smith requested that she be told all the reasons for the denial pending her hearing, she was told, "That is not how the legal game is played." Smith requested in writing:
That I receive, well before the fair hearing and preferably before the pre-hearing telephone conference scheduled September 16th, 1999, a detailed written explanation of why Adoption Support was denied on the basis of not finding extenuating circumstances.
No response was received from DSHS.
¶ 8 On September 16, 1999, a prehearing conference with the assistant attorney general, the prehearing administrative law judge (ALJ), and Smith was held. Smith again asked to be told of all reasons for the denial of adoption assistance for M.S. No further reasons, beyond the reason that extenuating circumstances did not exist to allow a post-finalization application, were given by DSHS at the prehearing conference. The AAG stated she intended to make a motion to dismiss the request for a hearing. No such motion was ever filed.
¶ 9 In a letter to Smith from a different AAG dated October 29, 1999, three weeks before the scheduled hearing, the AAG stated: "[I]n this case, eligibility issues include: (1) whether the receipt of a TANF grant equates AFDC eligibility; (2) whether the adoption court orders contain necessary `contrary to the welfare' language; and (3) whether a reasonable effort was made to place the child with appropriate adoptive parents without providing adoption assistance."
¶ 10 At the hearing in November of 1999, DSHS raised a new eligibility issue that M.S. was not eligible for assistance because the adoption agency had not taken legal custody of her. Because the only reason for the denial of the application that had been given by DSHS in the denial letter and in the prehearing conference was that extenuating circumstances did not allow a post-adoption application, the ALJ bifurcated the hearing into two parts. The first part addressed only the reason given by DSHS in the denial and prehearing conference: the lack of extenuating circumstances.
¶ 11 Following the conclusion of that hearing, the ALJ requested that DSHS give Smith any of the eligibility reasons upon which the denial was based. DSHS then issued another denial letter listing three reasons for the denial of the application for assistance: (1) the relinquishment order lacks the required "contrary to the welfare" language; (2) DSHS policy sets forth the conditions under which a child placed for adoption through a private nonprofit child placing agency may be eligible for adoption assistance and the circumstances of this case did not meet those conditions; and (3) there is no showing that a reasonable, but unsuccessful, effort was made to place the child without providing adoption assistance. The hearing was continued to allow Smith to prepare and reconvened to address all of the eligibility issues raised by DSHS.
¶ 12 After the hearing, the ALJ issued a 44-page initial decision which was affirmed in a review decision and final order. In its decision, the ALJ concluded that "the pre-adoption existence of a physical, mental, or emotional handicap which is unknown at the time of the finalization of adoption constitutes an `extenuating circumstance' within the meaning of federal law." The ALJ also concluded that the other grounds DSHS cited for denying Smith's application were without merit and determined that she was eligible for adoption assistance retroactive to the date of the adoption.
¶ 13 In addition to the substantive legal issues, Smith also raised a procedural due process issue claiming that she had not received a timely decision on her application for adoption assistance and that she had not received all of the reasons for the denial in a timely manner. The ALJ found that DSHS had failed in its duty under 45 C.F.R. § 205.10 to give Smith all of the reasons for the denial. The ALJ stated:
While the only reason given in the denial letter and at the pre-hearing conference was the lack of extenuating circumstances to allow post-finalization application, the attorney representing [DSHS] then gave three eligibility reasons in a letter between the time of the prehearing conference and the hearing and raised a new eligibility *336 issue on the first day of the hearing. This does not comport with the hearing rights mandated under federal law. While the unfairness of the lack of timely notice of reasons for denial was somewhat mitigated by the bifurcation of the hearing and allowing the Appellant time to prepare to address those reasons, it has unfortunately delayed the resolution of this case which is detrimental to [M.S.]. However, the Appellant has prevailed on the merits of the case and no further remedy is available in this forum. With regard to the delay by [DSHS] in making a decision on the application, this is somewhat rectified by the fact that federal law allows for retroactive adoption support back to the date of the child's adoption and that this has been ordered in this case.
The ALJ declined to rule on whether the State had failed to meet its duties under federal law to actively promote the adoption assistance program.
¶ 14 After obtaining benefits, Lynn and her daughter sued for damages in Island County Superior Court, naming the State of Washington and three individuals: Lois Chowen, Marilyn Akiyama, and Shirley Gantzer. The Smiths' claims were for breach of contract, negligence and civil rights violations under 42 U.S.C. § 1983. They also claimed that the ALJ's findings should be used to create tort liability in this case under the theory of offensive issue preclusion. The State moved for summary judgment arguing that (1) there was no contract between DSHS and Smith to provide benefits, (2) the governing statutes do not create a tort remedy, and (3) 42 U.S.C. § 1983 does not apply because the named defendants have absolute immunity, the Adoption Assistance and Child Welfare Act does not create a constitutional right, the Act provides a remedy in the form of an administrative appeal, and the named defendants are entitled to qualified immunity.
¶ 15 The trial court dismissed all of the Smiths' claims. The Smiths appeal all of the issues raised below, except for the breach of contract claim.

ANALYSIS
Statutory Background
¶ 16 The Federal Adoption Assistance Program is part of the Adoption Assistance and Child Welfare Act (AACWA), codified as Title IV-E of the Federal Social Security Act. The program is administered in Washington by DSHS under the authority of 42 U.S.C. § 673 and under both state regulations and federal policy guidelines.[1]
¶ 17 The purpose of the adoption support program is to encourage the adoption of special needs children "in the legal custody of public or private nonprofit child care agencies who would not be adopted if support for the child was not available."[2] Both the state and federal programs require a prospective adoptive parent to apply for participation in the program, be approved for the program, and have an adoption support agreement signed and in place at the time the adoption is finalized.[3] However, adoption support is also available in cases where the application was filed after the adoption was final if extenuating circumstances exist.[4]
¶ 18 DSHS determines whether a child is eligible for benefits under this program. If an application for participation in the program is denied "or is not acted upon with reasonable promptness," the Social Security Act and the implementing regulations require an opportunity for a fair hearing.[5] Such a hearing "shall include consideration of . . . an[y] agency action, or failure to act with reasonable promptness, on a claim for financial *337 assistance, which includes delay in reaching a decision on eligibility. . . . "[6]
¶ 19 In compliance with federal law, Washington provides for a fair hearing under its Administrative Procedures Act (APA), chapter 34.05 RCW. The APA allows an appeal for a denial of an application, and also includes an appeal to direct an agency to enter an order if there is undue delay in making a decision.[7]
Civil Rights
¶ 20 The Smiths claim that the State and the various named state officials violated their civil rights by (1) delaying the processing of their application for adoption assistance, and (2) by not timely providing them with all of the reasons for denying the application, thus delaying the appeals process. Under 42 U.S.C. § 1983:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . . . [8]
However, "neither a State nor its officials acting in their official capacities are `persons' under [42 U.S.C.] § 1983."[9] Thus, the State of Washington cannot be held liable for violations of 42 U.S.C. § 1983, but the named individuals here sued in their individual capacities, may be held liable.[10]
¶ 21 In order to be found liable for civil rights violations, the Smiths must show that the actions of the named individuals deprived them of a constitutional or statutory right. The Smiths claim that the actions of the DSHS employees deprived them of rights guaranteed to them under various statutory and regulatory provisions of the AACWA as well as their procedural due process and equal protection rights guaranteed under the Fourteenth Amendment of the United States Constitution.[11]
Statutory Claims
¶ 22 In Maine v. Thiboutot,[12] the United States Supreme Court held for the first time that actions under 42 U.S.C. § 1983 may be brought against state actors to enforce rights created by federal statutes as well as by the Constitution. Since then, the Court has been hesitant to find enforceable claims of right in federal legislation enacted pursuant to the spending power. In fact, only twice, when the statute in question unambiguously conferred a specific monetary entitlement or benefit upon the plaintiffs, has the Court found congressional intent for private enforcement under § 1983.[13]
¶ 23 In Suter v. Artist M.,[14] the United States Supreme Court addressed the issue of *338 whether a specific provision of the Adoption Assistance and Child Welfare Act (AACWA), 42 U.S.C. § 671(a)(15), created a right enforceable under § 1983. That section of the AACWA says the state plan shall provide that "reasonable efforts" be made to prevent removal of children from their homes and to facilitate reunification of families where removal has occurred.[15] The appellants claimed that this statutory section conferred upon the child beneficiaries of the AACWA the right to enforce the requirement that the State make "reasonable efforts" to prevent a child from being removed from his or her home, and once removed to reunify the child with his or her family.
¶ 24 The Suter Court found this statutory provision did not create a private and enforceable right on behalf of children in the state's child welfare system, stating:
Careful examination of the language relied upon by respondents, in the context of the entire Act, leads us to conclude that the "reasonable efforts" language does not unambiguously confer an enforceable right upon the Act's beneficiaries. The term "reasonable efforts" in this context is at least as plausibly read to impose only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary in the manner [of reducing or eliminating payments].[16]
¶ 25 However, in 1994 Congress amended the Social Security Act to include the following section:
In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in Suter v. Artist M., 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in Suter v. Artist M. that section 671(a)(15) of this title is not enforceable in a private right of action.[17]
Congress therefore overruled Suter to the extent that it says that there is no private cause of action to enforce a provision simply because the provision is included in a section requiring a state plan or specifying the required contents of a state plan; however, in doing so Congress created no new private cause of action and did not alter the holding in Suter.
¶ 26 Five years after Suter, the Washington Supreme Court in Coalition for the Homeless v. DSHS[18] addressed the same issue with regards to 42 U.S.C. § 671(a)(16), which states:
In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which
. . . .
(16) provides for the development of a case plan (as defined in section 675(1) of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in section 675(5)(B) of this title with respect to such child[.][19]
Citing both Suter and the congressional amendment responding to Suter, the Homeless court applied the three-part test set forth in Wilder v. Virginia Hospital Association[20] to determine whether an enforceable right existed under the "case plan" sections of the AACWA. That test requires consideration of the following three questions:

*339 (1) Was the provision in question intended to benefit the plaintiffs?
(2) Does the statutory provision in question create binding obligations on the state, rather than merely expressing a congressional preference?
(3) Is the interest plaintiffs assert specific enough to be enforced judicially, rather than being vague and amorphous?[21]
The Homeless court found that "[w]hile the provisions of any individual case plan may be specific enough to be enforced judicially, the notion that case plansin generalare to be implemented is too vague and amorphous to be enforced."[22] The court therefore found no private cause of action exists.
¶ 27 Five years later, the United States Supreme Court in Gonzaga University v. Doe[23] expressly held that the initial inquiry in determining whether a cause of action exists under § 1983 is whether the statutory language clearly and unambiguously creates a right. As the Gonzaga Court held:
We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983. Section 1983 provides a remedy only for the deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. Accordingly, it is rights, not the broader or vaguer "benefits" or "interests," that may be enforced under the authority of that section.[24]
The Gonzaga Court further held:
In sum, if Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous termsno less and no more than what is required for Congress to create new rights enforceable under an implied private right of action.[25]
¶ 28 Since the Court's decision in Gonzaga, the Washington Supreme Court in Braam v. State[26] has taken the opportunity to reevaluate whether the same provisions of the AACWA at issue in Coalition for the Homeless[27] created a right enforceable under § 1983. This time the court was more dismissive of the plaintiff's claims. The court stated that it need not apply the three-part Wilder test because the claims failed under "the threshold factor established in Gonzaga"[28] that "[s]pending clause legislation must contain specific `rights creating' language before a court can find an implied cause of action or right enforceable under 42 U.S.C. § 1983."[29] Having found no such rights creating language, the Braam court held that 42 U.S.C. § § 671(a)(16) and 675(1) do not create an enforceable right to injunctive relief.
¶ 29 In light of these precedents, we find that none of the statutory provisions cited by the Smiths contain specific language creating rights and therefore do not give rise to a right enforceable under § 1983. Moreover, the federal regulations and the internal guidelines promulgated by DSHS cannot give rise to an enforceable right because no such right has been created in the governing statutes. Thus, the Smiths' § 1983 claims must fail.
¶ 30 Looking first to the statutes, the Smiths cite 42 U.S.C. § 673(a)(1)(B) which states in pertinent part:
Under any adoption assistance agreement entered into by a State with parents who *340 adopt a child with special needs, the State
. . . .
(ii) in any case where the child meets the requirements of paragraph (2), may make adoption assistance payments to such parents, directly through the State agency or through another public or nonprofit private agency, in amounts so determined.
This statutory provision only provides that a state may make adoption assistance payments to qualifying parents directly through a state agency or through another public or nonprofit agency. The provision does not contain any specific language creating rights.
¶ 31 The Smiths also point to 42 U.S.C. § 671(a)(12) which states:
In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which
. . . .
(12) provides for granting an opportunity for a fair hearing before the State agency to any individual whose claim for benefits available pursuant to this part is denied or is not acted upon with reasonable promptness[.]
Again, this provision contains no specific language creating rights. Instead, like the statutory provisions at issue in Suter and Braam, it simply directs a state to have a plan containing certain provisions before the state may be eligible for payments. The State of Washington has complied with this requirement.
¶ 32 The Smiths also cite several implementing regulations they claim create a right enforceable under § 1983. These regulations include 45 C.F.R. 1356.40(f), which states: "The State agency must actively seek ways to promote the adoption assistance program." They also point to 45 C.F.R. 205.10, the regulations governing the administration of hearings under the AACWA. Specifically they cite 45 C.F.R. 205.10(a)(3) which states: "A State plan . . . shall provide for a system of hearings under which: . . . (3) Every applicant or recipient shall be informed in writing at the time of application and at the time of any action affecting his claim: (i) Of his right to a hearing. . . ." The Smiths claim that the named individuals in this case failed to tell them of their appeals rights, and worse yet, gave them incorrect information, telling them they had to wait until a decision was rendered before they could request a hearing. Finally, they cite 45 C.F.R. 205.10(a)(4)(i)(B) which requires the state plan to provide for a system of hearings under which the state or local agency is required to give the applicant adequate written notice of among other things, "the reasons for the intended agency action." The Smiths claim that the named defendant's failure to give them timely notice of all the reasons for the denial of the application gives rise to an action under § 1983.
¶ 33 "An administrative regulation, however, cannot create an enforceable § 1983 interest not already implicit in the enforcing statute."[30] Or as announced by the United States Supreme Court in Alexander v. Sandoval, "it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself."[31] These regulations, standing alone, cannot create a right enforceable under § 1983 that is not already present in the AACWA. Having found no rights enforceable under § 1983 in the provisions of the AACWA cited by the Smiths, we are constrained from finding any such rights in the corresponding implementing regulations.
¶ 34 Finally, the Smiths direct our attention to DSHS's internal "practices and procedures guide" and "program expectations" which state that completed applications for adoptions assistance shall be processed within 30 days of receipt. These internal expectations and guidelines also cannot create a right enforceable under § 1983; only Congress has that power.
Procedural Due Process
¶ 35 The Smiths also claim that the state employees' failure to follow DSHS's *341 internal guidelines and procedures, as well as to follow the requirements set forth in 45 C.F.R. 205.10 deprived them of their procedural due process rights, giving rise to a cause of action under § 1983. For there to be a procedural due process violation, we must first find that the State deprived the Smiths of a constitutionally protected liberty or property interest.[32] However, even if we were to find that the Smiths have been deprived of a protected property interest (a questionable contention given the fact that they have been afforded their hearing and have received benefits retroactive to the adoption) the Smiths do not challenge any of the established state procedures as lacking in due process, but instead cite the unauthorized failure of state agents to follow established state procedure. Under Parratt v. Taylor[33] and its progeny, this does not qualify as an alleged violation of the due process clause of the Fourteenth Amendment.
¶ 36 In Parratt, the United States Supreme Court held that the negligent loss of a prisoner's property by state employees did not amount to a deprivation without due process. There, a prisoner's property was lost because prison officials did not follow proper procedures in handling incoming mail. In finding the prisoner had failed to allege a violation of due process, the Court reasoned:
Although [the prisoner] has been deprived of property under color of state law, the deprivation did not occur as a result of some established state procedure. Indeed, the deprivation occurred as a result of the unauthorized failure of agents of the State to follow established state procedure. There is no contention that the procedures themselves are inadequate nor is there any contention that it was practicable for the State to provide a predeprivation hearing. Moreover, the State of Nebraska has provided respondent with the means by which he can receive redress for the deprivation. The State provides a remedy to persons who believe they have suffered a tortuous loss at the hands of the State. . . . Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process. The remedies provided could have fully compensated the respondent for the property loss he suffered, and we hold that they are sufficient to satisfy the requirements of due process.[34]
In short, because the property loss resulted from the unauthorized failure of a state employee to follow state procedures, and because an adequate remedy existed under the state's tort claims law, there was no violation of due process.
¶ 37 In Kepl v. Washington,[35] this court applied Parratt's holding in the context of the suspension of a nursing home license. In Kepl, the plaintiff nursing home operators claimed a violation of due process because the State had revoked their license without allowing time for compliance as provided by the statutes. In finding that Kepls had failed to allege a violation of due process, we applied Parratt's reasoning and held:
Mrs. Kepl does not challenge the established State procedures for delicensure and decertification. Her complaint is directed to the failure of the Department's employees to follow those procedures. We therefore conclude that Parratt's rationale applies. That is, since the State of Washington provides Mrs. Kepl with an adequate remedy under its tort claims procedure, RCW 4.92.010 et seq., no deprivation of property without due process occurred.[36]
¶ 38 Finally, the Ninth Circuit in Joshua v. Newell[37] also has applied Parratt's analysis in the context of Washington State law. In that case, the Joshuas allegedly had their foster home care license suspended without *342 having been notified of their right to a hearing. The Joshuas alleged that the failure of the State to inform them of their hearing rights led to their failure to request a hearing within the statutory 30 days allowed by the statute. The Ninth Circuit found that the Joshuas had failed to allege a violation of their due process rights. Specifically, the court found pursuant to Parratt and Kepl that the failure to notify the Joshuas of their hearing rights resulted from "`the unauthorized failure of agents of the State to follow established state procedure'" and that the State of Washington's tort claims law afforded the Joshuas the opportunity to fully compensate their property loss.[38]
¶ 39 The facts of the present case are similar to Parratt, Kepl and Joshua. The Smiths do not challenge the established state procedures for determining whether they were was entitled to adoption assistance. Instead they allege that they suffered a deprivation due to the failure of the employees of DSHS to follow established procedures. Because the State of Washington affords the Smiths the opportunity to recover any property loss due to the tortuous acts of state employees through RCW 4.92.010.200, no deprivation of property without due process occurred. Because there was no procedural due process violation, the Smiths' § 1983 claims fails.
Negligence
¶ 40 The Smiths seek the remedies provided by Washington's tort claims statute by filing a negligence action against the State of Washington for the alleged negligent actions of the named DSHS employees. According to the public duty doctrine, "a government official's negligent conduct does not expose the government to tort liability unless the plaintiff can show that a duty was owed to the plaintiff, as opposed to the public in general."[39] There are four established exceptions to the public duty doctrine:
(1) when the Legislature expresses by statute "an intent to identify and protect a particular and circumscribed class of persons (legislative intent);" (2) when a governmental agent has responsibility to enforce statutory requirements and the plaintiff is within the class the statute was intended to protect, but he agent fails to take corrective action, despite actual knowledge of a statutory violation (failure to enforce); (3) when a governmental agent assumes a duty to warn or come to the aid of the plaintiff, then fails to exercise reasonable care (rescue doctrine); and (4) when the injured plaintiff is set off from the general public by a relationship between him or her and the governmental agent, and the agent gives explicit assurances to the plaintiff or assurances are inherent in a duty vested in the governmental entity, and the plaintiff relies upon those assurances (special relationship).[40]
"A determination that an exception to the public duty doctrine applies is tantamount to a conclusion that the defendant owed a duty to the plaintiff."[41]
¶ 41 The Smiths argue that the legislative intent exception to the public duty doctrine applies in their case. Specifically, they argue that the federal hearings notice requirements under 45 C.F.R. 205.10 and DSHS's internal "practices and procedures guide" and "program expectations" stating that completed applications for adoption assistance be processed in 30 days evince a legislative intent to identify and protect a particular and circumscribed class of persons thereby exposing the State of Washington to tort liability.
¶ 42 However, the evidence of clear legislative intent necessary to create a duty "must be created by a statute and not by `regulations, manuals and directives purportedly authorized under [a] statute.'"[42] The Smiths' reliance on the federal regulations *343 and internal guidelines do not by themselves evince the clear legislative intent necessary to qualify under the legislative intent exception to the public duty doctrine.[43]
¶ 43 However, the Smiths have established a prima facie case for negligence under the special relationship exception to the public duty doctrine. Specifically, the Smiths allege that Lynn Smith specifically inquired about what her hearing rights were with respect to her request for adoption assistance. The Smiths have presented evidence indicating that DSHS officials gave Lynn Smith inaccurate information, telling her that she had to wait until her request was denied before she could request a hearing. This evidence includes Lynn Smith's declarations and an email exchange between DSHS employees.
¶ 44 This information was inaccurate, because the regulations require an opportunity for a hearing "to any applicant who requests a hearing because his or her claim for financial assistance . . . is denied, or is not acted upon with reasonable promptness."[44] The Smiths claim they relied on the inaccurate information, causing the delay that caused their damages.
¶ 45 "`The special relationship exception is a "focusing tool" used to determine whether a local government "is under a general duty to a nebulous public or whether that duty has focused on the claimant."'"[45] A special relationship arises where:
"`(1) there is direct contact or privity between the public official and the injured plaintiff which sets the latter apart from the general public, and (2) there are express assurances given by a public official, which (3) gives [sic] rise to justifiable reliance on the part of the plaintiff.'"[46]
Elaborating on the special relationship exception, our Supreme Court has stated in Taylor v. Stevens County:[47]
A duty of care may arise where a public official charged with the responsibility to provide accurate information fails to correctly answer a specific inquiry from a plaintiff intended to benefit from the dissemination of the information. In [Rogers v. Toppenish, 23 Wash.App. 554, 596 P.2d 1096 (1979) ], the court imposed a duty of care on a public official, where the official in response to a specific inquiry, gave the plaintiff inaccurate zoning information. The court relied on Restatement (Second) of Torts § 552(3) (1977) which provides:
(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.
In this narrow situation, a special relationship is created because: (1) there is direct contact between the public official and the plaintiff, (2) the official, in response to a specific inquiry, provides express assurances that a building or structure is in compliance with the building code, and (3) the plaintiff justifiably relies on the representations of the official. The creation of a special relationship between the plaintiff and the public official gives rise to a duty to use reasonable care when furnishing information. Once the existence of duty is established, the plaintiff may proceed in tort against the local government.[48]
¶ 46 Here, DSHS was charged with the responsibility to provide accurate information regarding the Smiths' appeal rights by virtue *344 of the federal regulations that state: "Every applicant or recipient shall be informed in writing at the time of application and at the time of any action affecting his claim: (i) Of his right to a hearing, as provided in paragraph (a)(5) of this section; (ii) Of the method by which he may obtain a hearing. . . ."[49] Furthermore, the Smiths have provided evidence that Lynn Smith specifically inquired as to what her hearing rights were and was given false information that she relied on to her and her child's detriment. In other words, they argue, had Lynn Smith been given accurate information she would have appealed sooner, and would have received the adoption assistance needed to adequately treat her special needs child.
¶ 47 The State offers three arguments that the special relationship exception should not apply in this case. First, the State argues that the Taylor case is distinguishable because the case the Taylor court relied upon, Rogers v. Toppenish,[50] dealt with zoning issues. Specifically, the State argues that instrumental to the holding in Rogers is the fact that zoning requirements of a community plan are held solely by the city officials and that this fact gives rise to the duty of such officials to convey accurate information when specifically asked. However, in this case DSHS was charged with the responsibility to provide accurate information regarding the Smiths' appeal rights by virtue of the federal regulations, not by virtue of some monopoly on information.
¶ 48 Second, while the State concedes that there was privity between the Smiths and DSHS, it argues that DSHS did not expressly assure Lynn Smith that she could not appeal based on a failure of DSHS to act with reasonable promptness. Contrary to the State's claim, there is plenty of evidence in the record to show Smith was told that she could only appeal after a decision was made. This is the same as DSHS telling her she could not appeal for failing to act with reasonable promptness.
¶ 49 Third, the State argues that the information related to Lynn Smith was a statement of law, and there can be no justifiable reliance on a statement of law. However, information as to what Smith's appeal rights were is no more or less a matter of law than was the zoning information at issue in Rogers, or the building code information discussed in Taylor. Smith was merely asking what the regulations said about her appeal rights. This is the same thing as asking what the zoning codes are or whether a structure is in compliance with building codes. Here, the substance of the wrong information is irrelevant to the purpose of the rule.
Collateral Estoppel
¶ 50 Having found that the Smiths have a claim in negligence against the State that survives summary judgment, we must address the Smiths' argument that offense collateral estoppel applies to this claim. The party asserting collateral estoppel bears the burden of proving four requirements:
(1) the issue decided in the prior adjudication must be identical with the one presented in the second; (2) the prior adjudication must have ended with a final judgment on the merits; (3) the party against whom the plea of collateral estoppel is asserted must have been a party or in privity with a party to the prior litigation; and (4) application of the doctrine must not work an injustice.[51]
¶ 51 The issue decided in the administrative hearing was whether the Smiths were entitled to adoption assistance benefits, not whether the State was negligent under the special relationship exception to the public duty doctrine. Collateral estoppel does not apply in this case.
¶ 52 For the above reasons, the trial court's order granting summary judgment is reversed and the matter remanded for trial.
WE CONCUR: ELLINGTON and AGID, JJ.
NOTES
[1] See WAC XXX-XX-XXXX through -0390 and United States DHHS Child Welfare Policy Manual, Sections 8.2 and 8.4G (question 2).
[2] WAC XXX-XX-XXXX.
[3] RCW 74.13.109; RCW 26.33.320; WAC XXX-XX-XXXX; 42 U.S.C. § 671(a)(12); 45 C.F.R. 1356.40(b)(1).
[4] WAC XXX-XX-XXXX; DHHS Administration for Children, Youth and Families' Policy Interpretation Questionnaires 88-06 and 92-02.
[5] 42 U.S.C. § 671(a)(12); 45 C.F.R. 205.10.
[6] 45 C.F.R. 205.10(12)(i).
[7] See RCW 34.05.413(2) and (4).
[8] 42 U.S.C. § 1983.
[9] Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).
[10] See Hafer v. Melo, 502 U.S. 21, 31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991)("We hold that state officials, sued in their individual capacities, are `persons' within the meaning of [42 U.S.C.] § 1983 . . . nor are state officials absolutely immune from personal liability under [42 U.S.C.] § 1983 solely by virtue of the `official' nature of their acts.").
[11] Although the Smiths mention equal protection in conjunction with procedural due process several times in their brief, they do not explain how the guarantees of equal protection apply in their case; thus, the equal protection issue is waived. RAP 10.3(a)(5).
[12] Maine, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).
[13] See Wright v. Roanoke Redev. & Housing Auth., 479 U.S. 418, 430, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)(Court allowed a § 1983 suit by tenants to recover past overcharges under a rent-ceiling provision of the Public Housing Act because the statutory provision unambiguously conferred a mandatory benefit focusing on the individual family and its income.); Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 522-23, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990)(Court allowed a § 1983 suit brought by healthcare providers to enforce a reimbursement provision of the Medicaid Act on the ground that the provision explicitly conferred a monetary entitlement upon the plaintiff.)
[14] Suter, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992).
[15] 42 U.S.C. § 671(a)(15).
[16] Suter, 503 U.S. at 358-63, 112 S.Ct. 1360.
[17] 42 U.S.C. § 1320a-2.
[18] Coalition for the Homeless v. DSHS, 133 Wash.2d 894, 949 P.2d 1291 (1997).
[19] Coalition for the Homeless, 133 Wash.2d at 926, 949 P.2d 1291.
[20] Wilder, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990).
[21] Coalition for the Homeless, 133 Wash.2d at 928, 949 P.2d 1291 (citing Wilder, 496 U.S. at 509, 110 S.Ct. 2510).
[22] Coalition for the Homeless, 133 Wash.2d at 929, 949 P.2d 1291.
[23] Gonzaga University v. Doe, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002).
[24] Gonzaga University, 536 U.S. at 283, 122 S.Ct. 2268 (emphasis in original).
[25] Gonzaga University, 536 U.S. at 290, 122 S.Ct. 2268.
[26] Braam v. State of Washington, et al., 150 Wash.2d 689, 81 P.3d 851 (2003).
[27] Coalition for the Homeless, 133 Wash.2d at 894, 949 P.2d 1291.
[28] Braam, 150 Wash.2d at 714 n. 8, 81 P.3d 851.
[29] Braam, 150 Wash.2d at 714, 81 P.3d 851 (quoting Gonzaga University, 536 U.S. at 282-83, 122 S.Ct. 2268).
[30] Smith v. Kirk, 821 F.2d 980, 984 (4th Cir. 1987).
[31] Alexander v. Sandoval, 532 U.S. 275, 291, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).
[32] Cf. Nieshe v. Concrete Sch. Dist., 129 Wash. App. 632, 641, 127 P.3d 713 (2005).
[33] Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).
[34] Parratt, 451 U.S. at 543-44, 101 S.Ct. 1908.
[35] Kepl v. Washington, 34 Wash.App. 5, 659 P.2d 1108 (1983).
[36] Kepl, 34 Wash.App. at 11, 659 P.2d 1108.
[37] Joshua v. Newell, 871 F.2d 884 (9th Cir.1989).
[38] Joshua, 871 F.2d at 887 (quoting Parratt, 451 U.S. at 543, 101 S.Ct. 1908).
[39] Yonker v. DSHS, 85 Wash.App. 71, 76, 930 P.2d 958 (1997) (citing Taggart v. State, 118 Wash.2d 195, 217, 822 P.2d 243 (1992)).
[40] Yonker, 85 Wash.App. at 76-77, 930 P.2d 958 (quoting Bailey v. Forks, 108 Wash.2d 262, 268, 737 P.2d 1257 (1987)).
[41] Yonker, 85 Wash.App. at 77, 930 P.2d 958 (citing Taggart, 118 Wash.2d at 218, 822 P.2d 243).
[42] Cameron v. Janssen Bros. Nurseries, Ltd., 7 F.3d 821, 826 (9th Cir.1993), overruled in part on other grounds by United States v. Olson, ___ U.S. ___, 126 S.Ct. 510, 163 L.Ed.2d 306, 310 (2005) (quoting Kirk v. United States, 270 F.2d 110, 118 (9th Cir.1959)).
[43] See Cameron, 7 F.3d at 826, overruled in part on other grounds by Olson, ___ U.S. ___, 126 S.Ct. 510.
[44] See 45 C.F.R. 205.10(a)(5) (emphasis added).
[45] Babcock v. Mason County Fire Dist. No. 6, 144 Wash.2d 774, 786, 30 P.3d 1261 (2001) (quoting Taylor v. Stevens County, 111 Wash.2d 159, 166, 759 P.2d 447 (1988)).
[46] Babcock, 144 Wash.2d at 786, 30 P.3d 1261 (quoting Beal v. City of Seattle, 134 Wash.2d 769, 785, 954 P.2d 237 (1998)).
[47] Taylor, 111 Wash.2d 159, 759 P.2d 447 (1988).
[48] Taylor, 111 Wash.2d at 171, 759 P.2d 447 (citations omitted).
[49] 45 C.F.R. 205.10(a)(3).
[50] Rogers, 23 Wash.App. 554, 596 P.2d 1096 (1979).
[51] State v. Williams, 132 Wash.2d 248, 254, 937 P.2d 1052 (1997).