[No. 37315-3-I.   Division One.   February 10, 1997.]

Joshua Yonker, et al., *Appellants,* v. The Department of Social and Health Services, et al., *Respondents.*

*Breean L. Beggs, Philip J. Buri,* and *Brett & Daugert,* for appellants.

*Christine O. Gregoire, Attorney General,* and *Susan M. Edison* and *Michael E. Tardif, Assistants,* for respondents.

ELLINGTON, J. — To protect abused children and their families, the Legislature requires the Department of Social and Health Services (DSHS) to investigate reports of possible child abuse. Maryann Snudden reported to DSHS that her two-and-a-half-year-old son was explicitly simulating intercourse and that her ex-husband, Alex Yonker, had a "bad pornography problem," which DSHS caseworkers acknowledged could indicate abuse. Believing they needed a more specific allegation of abuse, however, caseworkers did not investigate further. Almost a year later, Snudden reported to DSHS that her son had told her his father touched him sexually. Because the child would not repeat the statement to the caseworker, DSHS again declined to take action, and told Snudden that she was obligated to comply with court-ordered visitation. Soon afterward, Yonker pleaded guilty to molesting his son. Snudden's damages suit against DSHS was dismissed on summary judgment when the trial court concluded that DSHS was shielded from liability by the public duty doctrine. We hold that the legislative intent exception to the public duty doctrine applies because Snudden and her son were members of the particular and circumscribed class of individuals the Legislature intended to protect, and that DSHS is thus not shielded from liability. We therefore reverse and remand for trial.

## FACTS[1]

Maryann Snudden and her ex-husband, Alex Yonker, shared custody of their young son, Joshua Yonker. Joshua spent Wednesdays, every other weekend, and six weeks in the summer with his father.

In June of 1992, Snudden noticed two-and-a-half-year-old Joshua explicitly acting out intercourse with a stuffed animal. When Snudden tried to explain to Joshua that his behavior was not appropriate and was something only mommies and daddies did, he pushed her and tried to put his erect penis in her belly button. Snudden immediately made an appointment with Child Protective Services (CPS).

The next day, Snudden told the CPS caseworker that she did not think anyone was molesting Joshua, but she thought he "was watching something, either it be pornography or someone having sex." She said Joshua's father had a "pornography problem" and that he lived in a studio apartment with his girlfriend where Joshua might witness them having intercourse.

Although the caseworker agreed that these facts could indicate abuse, the caseworker gave Joshua's case a risk factor of zero, meaning no risk, and told Snudden that without a more specific allegation of abuse, CPS would take no action.

Snudden took Joshua to the Brigit Collins House, a shelter for abused women and children, but Joshua was too young for them to treat him. They referred her to another counselor who also said it would be difficult to help him because he was so young. Discouraged, Snudden did not seek further assistance. She tried to make excuses to prevent Yonker from seeing Joshua, but Yonker occasionally became violent, so she let Yonker take Joshua to avoid having him involved in a tug-of-war.

---

[1]We set forth the facts presented to the court on summary judgment. DSHS does not argue these facts are insufficient to raise a jury question if a legal duty exists.

After Snudden first talked to CPS, Joshua's behavior began to change. He withdrew from other children, became violent toward her, and began having nightmares. Snudden noticed that his behavior was worse following visits with Yonker. Then in April 1993, while getting ready for bed, Joshua told her, "Daddy sucks wee-wee me." He repeated the same thing in front of Snudden's mother and husband.

Snudden called 911 and an officer arrived. The next day she called CPS. She told the caseworker about her previous report and about Joshua's behavior changes as well. The caseworker attempted to get Joshua to recount what happened, but when Joshua would not repeat what he had told his mother and grandmother, the caseworker told Snudden there was not much CPS could do. Snudden told the caseworker that Yonker had visitation rights and asked how she was supposed to protect Joshua. She was told that if the visits were court-ordered, she had to comply.

This caseworker also assessed Joshua's case as low risk, which she later explained was because the child made no disclosures to her, and the child was not in imminent danger of harm because the alleged abuser "wasn't going to see the child that day."

Soon after that, Yonker confessed to the Bellingham Police Department that he had molested his son. He eventually pleaded guilty to first degree child molestation during the period between January 1, 1992 and June 1, 1993. Yonker had previous convictions for indecent liberties and for trespass related to a peeping incident. Three months after Yonker pleaded guilty, Snudden[2] sued the Department of Social and Health Services for negligence in failing to investigate her report of possible child abuse.

The Department moved for summary judgment, arguing that CPS did not have a duty to discover and stop abuse in every case in which a report was made. In opposition to

---

[2]Snudden sued on her own behalf, and on behalf of Joshua.

the motion for summary judgment, Snudden submitted a declaration from a child abuse expert, who expressed the opinion that CPS:

> fell far below the standard of care required when interviewing, evaluating, and protecting Joshua Yonker and Maryann Snudden during both the June 1992 and April 1993 referrals. Specifically, RCW 26.44.050 required Child Protective Services to investigate and protect Joshua and Maryann Snudden in accordance with RCW 74.13. The simple passive recording of Maryann Snudden's complaints did not come close to fulfilling that duty.

The expert also concluded that CPS failed to follow its own guidelines for intake and assessment of child abuse complaints.

The Department argued that Washington does not recognize a cause of action for negligent investigation and that the State was immune from liability under the public duty doctrine. The trial court agreed, holding that the statute describing CPS's duty to investigate created an obligation to the public in general, not to a specific parent or child, and granted summary judgment of dismissal. This appeal followed.

## Summary Judgment Standards

■ We review a grant of summary judgment de novo. *Doherty v. Municipality of Metro. Seattle*, 83 Wn. App. 464, 468, 921 P.2d 1098 (1996). Our inquiry is the same as the trial court's, viewing the facts and their inferences in the light most favorable to the nonmoving party. *Doherty*, 83 Wn. App. at 468. A summary judgment may be affirmed only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Doherty*, 83 Wn. App. at 468.

## Public Duty Doctrine

■ The question raised here is whether DSHS owed a legal duty to Snudden and Joshua. Whether a duty exists

is a question of law. *Johnson v. State*, 77 Wn. App. 934, 937, 894 P.2d 1366, *review denied*, 127 Wn.2d 1020, 904 P.2d 299 (1995). Once a duty is established, whether the defendant breached the duty and whether that breach was a proximate cause of the plaintiff's injuries are normally questions of fact. *Johnson*, 77 Wn. App. at 937.

■ A defendant is liable for negligence only for breach of a duty of care owed to the plaintiff, not to the public at large. *McCluskey v. Handorff-Shermann*, 125 Wn.2d 1, 6, 882 P.2d 157 (1994). When a governmental agency is the defendant, this rule is known as the public duty doctrine. *Taylor v. Stevens County*, 111 Wn.2d 159, 163, 759 P.2d 447 (1988). Thus, a government official's negligent conduct does not expose the government to tort liability unless the plaintiff can show that a duty was owed to the plaintiff, as opposed to the public in general. *Taggart v. State*, 118 Wn.2d 195, 217, 822 P.2d 243 (1992). In other words, "a duty to all is a duty to no one." *Taggart*, 118 Wn.2d at 217 (quoting *Taylor*, 111 Wn.2d at 163).

■ ■ Courts have recognized numerous exceptions to the public duty doctrine. *Taggart*, 118 Wn.2d at 217-18. These exceptions are founded in traditional negligence principles, and determine the existence of a duty. In *Bailey v. Forks*, 108 Wn.2d 262, 268, 737 P.2d 1257 (1987), the court identified four such exceptions: (1) when the Legislature expresses by statute "an intent to identify and protect a particular and circumscribed class of persons (legislative intent);" (2) when a governmental agent has a responsibility to enforce statutory requirements and the plaintiff is within the class the statute was intended to protect, but the agent fails to take corrective action, despite actual knowledge of a statutory violation (failure to enforce); (3) when a governmental agent assumes a duty to warn or come to the aid of the plaintiff, then fails to exercise reasonable care (rescue doctrine); and (4) when the injured plaintiff is set off from the general public by a relationship between him or her and the governmental agent, and the agent gives explicit assurances to the plaintiff or assur-

ances are inherent in a duty vested in the governmental entity, and the plaintiff relies upon those assurances (special relationship). A determination that an exception to the public duty doctrine applies is tantamount to a conclusion that the defendant owed a duty to the plaintiff. *Taggart*, 118 Wn.2d at 218.

DSHS claims that the statute requiring it to investigate reports of child abuse was intended to protect society in general and does not create a duty to individuals, and that the public duty doctrine was correctly applied by the trial court to preclude DSHS's liability. Snudden argues, however, that the courts of this state have recognized a cause of action for negligent investigation of child abuse and that even if those cases do not establish DSHS's duty, all four of the exceptions to the public duty doctrine set forth in *Bailey* are satisfied here.

Snudden is correct that Washington recognizes a cause of action for negligent investigation of possible child abuse. At least three cases have so held. *See Lesley v. Department of Soc. & Health Servs.*, 83 Wn. App. 263, 272-73, 921 P.2d 1066 (1996); *Waller v. State*, 64 Wn. App. 318, 333-34, 824 P.2d 1225, *review denied*, 119 Wn.2d 1014, 833 P.2d 1390 (1992); *Dunning v. Paccerelli*, 63 Wn. App. 232, 238-39, 242, 818 P.2d 34 (1991), *review denied*, 118 Wn.2d 1024, 827 P.2d 1392 (1992). Each of those cases involved some affirmative state action that was allegedly undertaken upon inadequate investigation. In each case the court recognized a cause of action and found that immunity did not bar suit.[3]

But to say that the State must act responsibly once it decides to act is not necessarily to say that the State is required to act. We must therefore consider whether such a duty exists here.

---

[3]In *Dunning*, the court also found that the special relationship exception to the public duty doctrine prevented the doctrine from shielding DSHS from liability. *Dunning*, 63 Wn. App. at 243. The other two opinions do not discuss the public duty doctrine, although in *Lesley*, we focused on the same statute we examine here. *Lesley*, 83 Wn. App. at 273.

## Legislative Intent Exception

In *Donaldson v. Seattle*, 65 Wn. App. 661, 831 P.2d 1098 (1992), *review dismissed*, 120 Wn.2d 1031, 847 P.2d 481 (1993), the court construed the statutory mandate of the Domestic Violence Protection Act (DVPA) that police make arrests in domestic violence cases where legal grounds exist. The court held that in the face of clear legislative intent to protect a particular class of individuals by requiring specific conduct by government officials, the public duty doctrine did not shield the city from tort liability:

> It is well established that a statute which creates a governmental duty to protect particular individuals can be the basis for a negligence action where the statute is violated and the injured party was one of the persons designed to be protected. If the legislation evidences a clear intent to identify a particular and circumscribed class of persons, such persons may bring an action in tort for violation of the statute.

65 Wn. App. at 666-67 (footnotes omitted).

In chapter 26.44 RCW, the Legislature addressed abuse of children and DSHS's responsibility in regard to those children. In its declaration of purpose, the Legislature emphasized the importance of the bond between parents and their children, but noted that when parents cause nonaccidental injuries or sexually abuse or neglect their children, the State may intervene. RCW 26.44.010. Therefore, the Legislature provided for DSHS to receive reports of such incidents and required that "protective services shall be made available in an effort to prevent further abuses, and to safeguard the general welfare of such children[.]" RCW 26.44.010. In light of that intention, the Legislature requires DSHS to investigate reports of possible child abuse:

> Upon receipt of a report concerning the possible occurrence

of abuse or neglect, it shall be the duty of the law enforcement agency or the department of social and health services to investigate and provide the protective services section with a report . . . .

RCW 26.44.050.

We construed this statute last year in *Lesley v. Department of Soc. & Health Servs.*, 83 Wn. App. 263, 921 P.2d 1066 (1996) (decided after the briefs were filed in this case). We there considered a claim that DSHS caseworkers negligently investigated after daycare workers mistook Mongolian spots (a common African American birthmark) for bruises. The child was removed from her parents' care for six days. While we did not discuss the public duty doctrine, we noted that DSHS caseworkers had a statutory duty to investigate, and concluded that a "cause of action for negligent investigation thus exists against DSHS caseworkers." *Lesley*, 83 Wn. App. 273.

DSHS claims, however, that nothing in RCW 26.44 expresses the Legislature's intent to benefit a particular and circumscribed class of persons as required by the legislative intent exception. DSHS argues that the statute "identifies children, parents, and adult dependents (developmentally disabled), a class that is obviously broad rather than narrow and circumscribed." But DSHS overlooks the fact that the services required by RCW 26.44 are for children and adult dependents *who may be abused or neglected*, and their families, not all children and their parents. Nor does the distinction suggested by DSHS— "narrow" versus "broad"—find support in the case law. The requirement is not that the class be small or narrow, but that it be "particular and circumscribed." *Donaldson*, 65 Wn. App. at 667. "Particular" means "involving, affecting, or belonging to a part rather than the whole of something: . . . not universal." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1647 (3d ed. 1976). "Circumscribe" means "to set limits or bounds to: . . . to define, mark off or demarcate carefully." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 410 (3d ed. 1976). Neither of

these qualifiers necessarily means that the protected group must be small or narrow. Indeed, such is not the requirement. For example, the class of persons protected in *Donaldson*, victims of domestic violence, unfortunately cannot be described as small. It is, however, particular and circumscribed, as is the class sought to be protected here.

The State attempts to distinguish *Donaldson*, arguing that the DVPA requirement that victims of domestic violence be given "maximum protection" somehow particularized the class to be protected. But the fact that the statute mandates "maximum protection" in no way defines the class to whom such protection is owed. The State also attempts to distinguish *Donaldson* because the DVPA sets forth specific duties to be performed. But RCW 26.44 similarly sets forth specific steps for protection of child abuse victims and their families, including the specific duty to investigate reports of possible abuse. And in *Donaldson*, while the legislative intent exception was invoked to recognize a duty to make arrests, the majority refused to recognize a duty to investigate because, unlike here, no such duty was explicitly imposed by the statute. *Donaldson*, 65 Wn. App. at 671.

Relying on a provision of the purpose section of RCW 26.44, the State also argues that the Legislature intended services to be required only when the State has received a specific report of actual abuse, as opposed to a report of possible abuse. In other words, the State claims it owes no duty to one who reports he or she only suspects abuse. The provision upon which the State relies, however, references not investigation, but emergency intervention into the parent-child relationship, which will be permitted only upon verified information. *See* RCW 26.44.010. Nothing in that section implies that the State's duty to investigate arises only when it has a report of actual abuse. To the contrary, the relevant statute specifically requires investigation "of a report concerning *the possible occurrence of abuse*[.]" RCW 26.44.050 (emphasis added).

The State further argues that the purpose section of RCW 26.44 requires services be made available " 'in an effort' to prevent further abuse and to safeguard the 'general' welfare of children [,]" and that the State does not have an absolute duty to prevent every case of child abuse. First, Snudden does not argue that the State must somehow prevent all child abuse, nor of course do we so hold. Second, by this objection DSHS expresses its concern, echoed again at oral argument, that state resources will be overwhelmed if the Department is required to investigate all reports of possible child abuse. But the existence of a duty here, where caseworkers and supervisors agreed Snudden's report indicated possible abuse, does not necessarily mean that the Department has a duty to investigate reports of all kinds, without regard to circumstances. If there is a question whether a report is sufficient to invoke the duty to investigate, that issue will be resolved on a case-by-case basis. Nor do we address the scope or intensity of the investigation required, as those issues are not before us in this appeal. To the extent the State is concerned about state resources, such a concern is properly addressed to the Legislature, not to the courts. The Legislature imposed a specific duty on the Department, and the Legislature has abrogated governmental immunity (RCW 4.96.010). Presumably the Legislature takes the view that tort liability will have a salutary effect on the seriousness with which the State executes its responsibility. As the Supreme Court observed in a related context, "The existence of some tort liability will encourage DSHS to avoid negligent conduct and leave open the possibility that those injured by DSHS's negligence can recover." *Babcock v. State*, 116 Wn.2d 596, 622, 809 P.2d 143 (1991). Where the Legislature imposes a duty on an agency of government, concerns about resulting costs and burdens are for the Legislature, not the judiciary.

We conclude the public duty doctrine does not shield DSHS from Snudden's claim, because she and her son fall within the particular and circumscribed class of individu-

als the Legislature intended to protect in enacting RCW 26.44.[4] We therefore reverse and remand for trial.

COLEMAN and AGID, JJ., concur.

Review denied at 132 Wn.2d 1010 (1997).

---

[4]Because we find a duty exists under the legislative intent exception to the public duty doctrine, we do not address applicability of the other exceptions.