IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| CETH HEIDEMAN, KEILAH HEIDEMAN AND JANICE HEIDEMAN, as parent and guardian for the minor appellant D.H., | ) ) ) ) ) | No. 33093-1-III |
| Appellants, | ) ) | |
| v. | ) ) ) | UNPUBLISHED OPINION |
| CHELAN COUNTY, by and through its agency CHELAN COUNTY SHERIFF'S OFFICE a Washington Municipal Corporation; STATE OF WASHINGTON, by and through its subdivision Department of Social and Health Services and JOHN DOES #1-10, caseworkers/social workers for DSHS who cannot be Identified at this time, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Respondents. | ) ) | |

SIDDOWAY, J. — Three young adult children of Theron Heideman appeal the summary judgment dismissal of their complaints alleging Washington State and Chelan County agencies negligently investigated abuse committed by their father and stepmother, leaving the children in an unsafe home. The State and county presented evidence to the trial court that when the three Heideman children were interviewed by

agency employees between 2004 and 2009, they almost always denied being abused.

Frightened, manipulated, parentally-abused children may falsely claim to be safe in their homes, which makes it difficult to investigate reports of child abuse. When a plaintiff alleges a harmful failure to remove a child from a home and the child has repeatedly denied abuse, then, in order to avoid summary judgment dismissal, the plaintiff must present other evidence that the harmful failure to remove was caused by faulty methods of investigation or an incomplete investigation. Viewed in the light most favorable to the Heideman children, their evidence of negligent investigation by the State meets that burden. Evidence in support of their other claims does not.

We reverse the trial court's summary judgment dismissal of the Heideman children's claim of negligent investigation by the State. We affirm the remainder of its summary judgment rulings.

FACTS AND PROCEDURAL BACKGROUNG

Ceth, Keilah, and Danika Heideman are the biological children of Theron and Tobie Heideman.[1] Early in their lives, the Heideman children lived with their paternal grandmother, Janice Heideman, because both their parents were in jail on drug charges. After Theron's release from custody, Ceth, Keilah, and Danika moved back with their father, who began a relationship with Juana (sometimes called Juanita) Ponce. Although

---

[1] Given the predominantly common surname, we generally refer to members of the family by their first names. We intend no disrespect.

2

Juana did not marry their father, the Heideman children referred to her as their stepmom, and sometimes as their mom. Over time, Theron and Juana had four of their own children together.

Between 1999 and 2009, the Washington Department of Social and Health Services (DSHS) received a number of reports that Ceth, Keilah, and Danika were being physically or sexually abused by Theron and Juana. The Chelan County Sheriff's Office also received a couple of reports and was invited into a third investigation by DSHS. When the children were interviewed by employees of DSHS and the county sheriff, they usually denied being abused by their father and stepmother—on at least one occasion, adamantly. Eventually, however, all three admitted that for years they suffered beatings, including with electric cords, pieces of flexible plastic track,[2] and a metal paddle that Mr. Heideman made for punishing. They admitted having to "earn" food (and in Ceth's case, "earn" showers) by doing chores. Keilah admitted being subjected to escalating sexual molestation and eventually rape by her father, beginning at age 7. All three were ultimately removed from the Heideman/Ponce household.

In December 2010, Ceth, then 19 years old, and then 17-year-old Keilah and 16-year-old Danika, through their grandmother, sued the State for negligent investigation and related claims. In August 2011, they brought a similar action against Chelan County.

---

[2] Tracks made for use with the children's toy Hot Wheels™ cars.

3

The cases were consolidated.

Following discovery in which each of the Heideman children admitted that they usually denied parental abuse when interviewed by state and county employees, Chelan County, and later, the State, moved for summary judgment. Viewed in the light most favorable to the Heideman children as the non-moving parties, the trial court was presented with the following disputed and undisputed evidence of the State's and the county's notice and response to reports that the children were being abused.

### October 1999 – Danika

An unidentified third party reported to DSHS on October 28, 1999, that Danika, then age 4, got on the bus for her Head Start program looking like she was going to cry. She was sad because "my mom threw me across the room." Clerk's Papers (CP) at 572-73. According to State records, on November 1, DSHS employees Susan Moore and Sue Bridges "went out and looked at situation and reported that child not harmed." CP at 573. The referral was closed as "Information Only." *Id.*

### November 1999 – Keilah

An unidentified third party reported to DSHS on November 2, 1999, that Keilah, then age 6, went to the school office asking for ice for her lip. When asked what happened, she said her dad hit her before school. According to State records, on November 5, supervisor Moore, Ms. Bridges, and Rosa Montoya "went to school and home and report allegations not true." CP at 573. The referral was again closed as

4

information only.

## November 2004 – Report from Grandmother Janice Heideman

Janice reported to DSHS on November 28, 2004, that the day before, her three grandchildren, then ages 12, 11, and 10, had visited her and told her they were being physically disciplined by Juana with electric cords, metal fly swatters and a metal paddle, and that their father did not protect them. They said they were required to do all the household chores and were not allowed to eat unless they completed chores to Juana's satisfaction. They said that on November 24, Juana had awakened them at 1:00 a.m., spanked them with a metal paddle, and ordered them to finish cleaning the house. Janice stated that Keilah, then age 11, had a bruised collarbone from the November 24 incident.

DSHS investigator Tracy Cash interviewed Keilah at her middle school 10 days later, on December 8, at which point any bruise was evidently gone—none is mentioned in Ms. Cash's report. School counselor Jim Bowen attended the interview. According to DSHS records, Mr. Bowen told Ms. Cash before the interview that "Keilah had told him a few weeks previously that Juanita had hit her with a paddle." CP at 587. When questioned by Ms. Cash, however, Keilah said the last time Juana hit her with a paddle was a few years earlier, and that she got along with her stepmom. Ms. Cash's record of the interview states, "At this time Jim Bowen interjected and mentioned to Keilah that she needed to be responsible in her answers to this SW [social worker]. Keilah did not respond to this statement." *Id.*

5

In addition to speaking with Keilah, Ms. Cash contacted Theron at the family home. She described him as "somewhat reluctant to let me in his residence due to past CPS [Child Protective Services] involvement." *Id.* Theron denied "punish[ing] his children in excess" and accused his mother of trying to cause trouble. *Id.* Theron and Juana signed an agreement not to use physical punishment on the children. The referral was closed.

Keilah later testified in deposition (although not specific to any particular date or incident) that while she had repeatedly denied being abused when interviewed by DSHS, her father

> put a lot of—a lot of emotional guilt on us. He'd be like, "If you say anything, you would—this—that's gonna break up the whole family. You're gonna get taken away, your little brothers and sisters will get all put in separate foster homes. You will never be able to see them again."

CP at 140. Keilah added, "I love my little brothers and sisters . . . too much. I don't want that. I want to be able to see them. . . . I want them to grow up together." *Id.* Keilah also testified when deposed that she had feared that "if I said anything, I wasn't going to get any help and I'd be stuck at that house with him and he would know that I was—that I said something." CP at 139.

### May 2006 – Ceth

An unidentified third party reported to DSHS on May 15, 2006, that Ceth, then age 14, told him or her about three months earlier that Ceth, Keilah, and Danika, had to

"earn" food from Juana in exchange for chores and good behavior, and that Juana used food stamps received by the family to buy food only for the children who are under 11 years old (Juana's biological children). The report was treated as "Information Only;" no investigation was conducted. CP at 570.

### August 2006 – Report from Grandmother Heideman

Janice reported to DSHS on August 15, 2006, that she was told by a friend, Rosalie Edwards, that "one of this family's neighbors" had been told by Danika, then age 11, that Theron had sexually molested her in the past. CP at 570. In response to the report, social worker Karen Oyler contacted Detective Mike Harnett at the Chelan County Sheriff's Office with a request to participate in the investigation. The detective told Ms. Oyler that "Danika has been interviewed multiple times," "CPS has an extensive history on the family," and he would not assign the case because "there is nothing new to investigate." CP at 269.

Because the sheriff's office declined to participate, Ms. Oyler interviewed Danika alone at the Heideman home. This was the first time Ms. Oyler had been involved in an investigation alleging sexual abuse. According to Ms. Oyler's contemporaneous notes, she interviewed Theron and 11-year-old Danika together. (She "meets Theron and Danika" at the family home and "questioned Danika with Theron present." CP at 270, 272.) Danika "denied past sexual abuse and stated if someone was touching her she

7

would tell her Dad." CP at 272.

Theron accused his mother of harassing him. Ms. Oyler reported, "It appeared like Danika was being truthful." *Id.* She closed the referral as unfounded.

### June 2007 – Keilah

The mother of a friend of Keilah, who was then age 14, reported to DSHS on June 18, 2007, that "Keila[h] has told the referrant, referrant's daughter, and other people that her dad beats her and some[times] beats her with a stick and that she wants some[one] to call the cops for her." CP at 569. DSHS contacted the Chelan County Sheriff's Office and asked that a detective accompany its social worker to investigate.

Social worker Kathie Pete and Detective Kevin Files went to the Heideman home to interview Keilah. Juana was present, so Ms. Pete asked Keilah to speak with her in the front yard. Keilah denied that her father hit her or her siblings. During the interview, Juana interrupted to say she did not want Keilah interviewed and that Ms. Pete and the officer needed to wait until Theron returned home. The detective told Juana that if necessary, Keilah could be taken to the police station to talk. Juana then sat on the front steps and watched the remainder of the interview from a distance.

Ms. Pete left a message for Theron asking to speak with him, and later recorded the fact that she and he had not been able to meet. Her investigation of the referral as to Keilah was open when the next report was received by DSHS in August 2007.

8

August 2007 – Ceth

At around midnight on August 28, a neighbor, Matt Webber, drove Ceth, then age 15, to the Chelan County Sheriff's Office. Theron had beaten Ceth, who was admitted to the hospital. When DSHS social worker John Plotz interviewed Ceth at the hospital, asking him what happened, Ceth said his father "had become angry with him and slammed his head against the wall, 'four or five times'" and then threw him on the floor, at which point Ceth fled. CP at 329. Ceth told Plotz that Theron had "beaten [him] up before" and that he had been beaten by his dad since he was 13 years old. *Id.* He stated, "'A year ago he kicked me in the mouth. I would have needed stiches, but my parents didn't take me to the hospital.'" *Id.*

Ceth asked to be allowed to go to Janice's house, but officers would not take him there in light of a restraining order in place listing Theron as well as Ceth as plaintiffs. Ceth told officers that the restraining order was "'bogus,' and that his father had put it in place unfairly." *Id.*[3]

On the morning after Ceth's hospitalization, Ms. Pete and Sheriff's Deputy Shawn Duke visited the Heideman home. No one answered the door, so they spoke with a neighbor. The neighbor's name is reflected in Ms. Pete's report, but it bears the caption "CONFIDENTIAL – DO NOT GIVE TO THE DAD;" the report explains that "the

---

[3] The order was later removed.

neighbors are afraid of Theron." CP at 620.

According to the report, the neighbor told Ms. Pete and the deputy that:

[T]hey are always fighting, cussing and swearing over there. Theron is violent with Ceth. . . . [Three] weeks ago she [saw] Theron yelling at Ceth and she saw him on the side of the house holding him and punching him in the face and stomach as his dad held him. She watched out the bedroom window and could see everything. [Two] days later Ceth came over to her house and he had a bruise on the side of his cheek . . . . The Deputy asked her to explain what she saw and she said he was holding him with one hand and punching closed fist with another hand, hitting his face and stomach. It was a fight over Ceth not cleaning the bathroom.
. . . She also said that [Theron] also yells at the girls. He has a bad temper. This past Saturday he threw something at Ceth.

*Id.*

Ms. Pete also conducted a recorded interview of Ceth. He told her Juana forbad him to shower or wash his clothes at the Heideman home. He implied he was only allowed to eat food there, if he was "really hungry." CP at 41-42.

During Ms. Pete's interview, Ceth volunteered that he "[did not] want you guys to tear apart the rest of the family." CP at 36. When she asked Ceth about other instances of abuse—specifically, the occasion the neighbor had reported that morning—Ceth avoided answering. He downplayed parental violence against his sisters, saying it was occasional, not like the violence against him, and eventually stated "[t]hey haven't got hit in ages." CP at 38. Towards the end of the interview, Ceth again reiterated,

CETH: This whole situation is scaring me. I don't want you guys to tear apart the rest of the family. I just don't want to be there.
MS. PETE: Okay. You don't want to be there? So, where could

10

you be?
CETH: I don't want you guys to tear the rest of my family apart. I want them to be there in peace.

CP at 43.

After completing the interview of Ceth, Ms. Pete returned to the Heideman/Ponce home and interviewed the other children, including the younger children, as a group around the kitchen table. Theron was outside with the deputy, where he was ultimately arrested on assault charges. During Ms. Pete's interview, the children all denied allegations of abuse, fighting, or yelling in the home, apart from problems created by Ceth. When later deposed, Ms. Pete testified she did not believe the children's take during the interview that they had "a perfect family and life and Ceth is the trouble maker." CP at 654. She testified, "I knew something was going on in that house." *Id.*

Ms. Pete thereafter arranged to interview a couple of the children individually at school. She first conducted a recorded interview of R., the oldest child Juana and Theron have together, at R.'s elementary school. R. told the social worker, "[i]t is scary [at] the house, kids get hurt." CP at 626. She told Ms. Pete that "Ceth and the older girls" get hit the most. *Id.* She also said that although her dad "is mad a lot," "Mom hits the girls the most," because her dad had been in jail twice and her mom does not want him to go back to jail: "[M]om hits me so dad won't." *Id.*

Ms. Pete then conducted a recorded interview of Danika, then age 12, at her middle school. Danika said that on the night Ceth fled and was hospitalized, she was

11

talking to him when he first started to get in trouble. Yet when asked whether she saw Theron bang Ceth's head against the wall, she replied, "I wasn't paying attention." CP at 52. When asked about discipline, Danika said she had not been hit for a year. But when Ms. Pete told Danika that R. told her something different, and asked, "[W]ho's telling me the truth?" Danika answered, "I don't know." CP at 55.

After learning that R. had revealed problems, Danika began to open up. Asked whether she was ever afraid of Theron when he's angry, Danika said, "I'm always afraid of him when he's angry." CP at 64. She admitted Juana had awakened her in the middle of the night to do chores, as had earlier been reported to DSHS; admitted she and her siblings did not get to eat when they wanted to; and admitted her parents "started hitting her when she was 4 years old." CP at 707. She told Ms. Pete that "chores take a long time and sometimes she has to miss doing her homework so that she can get her chores done so she won't get hit or in trouble"—as a result, her grades were not good. CP at 628.

Ms. Pete testified, when deposed, that there came a point in the interview of Danika "that [Danika] made me turn off the interview. She said, 'I'm'—'you have to turn the recorder off.' And she said she would like to write things down," which Ms. Pete said she could. CP at 655. Danika then asked if Keilah could be brought over to the school to be with her, and Ms. Pete arranged for that to be done.

Ms. Pete's report reflects what happened next:

12

Keilah was not happy. Danika asked her to please tell the truth when she went into the office but Keilah yelled at Danika and told her to stop telling lies about the family and she was going to get into trouble. Danika again told her that they need to tell the truth and not lie anymore. Keilah said she was not going to say anything and that she was going to catch the bus. She left the office. Danika was crying hard and worried her sister was going to tell her dad something.

CP at 628. Ms. Pete told Danika to catch her bus, promising she would be at the house when Danika got home. Ms. Pete then traveled to the Heideman home where she told Theron she had talked to the girls at school and "they are not to get in trouble for talking to me." *Id.* According to her report, "He did not say anything." *Id.*

DSHS determined the allegations of abuse of Ceth were founded. A no contact order was entered prohibiting contact between Ceth and Theron. Theron agreed to a voluntary services plan and agreed to move out until the assault charges were resolved. Because Theron was out of the house, Ceth returned home.

Ceth later wrote a letter to the court stating he did not wish to press charges against his father, would not attend an upcoming hearing, and wanted the restraining order to be lifted. In late November 2007, the criminal court rescinded the restraining order and Theron returned home.

### February 2008 – Ceth

Within a matter of a few months, on February 11, 2008, Ceth, then age 16, returned to the Chelan County Sheriff's Office after an argument with Theron left him afraid to return home. He was again taken into protective custody. But the next morning,

13

DSHS closed the placement "because services were being provided to the family, Ceth had not been harmed, and the case did not meet the criteria for a dependency action." CP at 461. Ceth then moved in with Janice. He has not lived in the Heideman/Ponce home since.

### August 2008 – Keilah

By August 2008, Keilah had committed acts that landed her in the juvenile justice system. On August 12, 2008, her probation officer made a DSHS referral, reporting Keilah, then age 15, was afraid to go home. Keilah was interviewed by social worker John Plotz and stated that Theron yelled, called the children names, and made them do all the housework, but she denied being mistreated by him. Mr. Plotz also interviewed Danika about the referral, and she, too, denied any mistreatment. DSHS closed the referral.

### November 2008 – Janice Heideman report

On November 17, 2008, Janice visited the Wenatchee Police Department to report that her friend, Rosalie Edwards, had now heard from Ms. Edwards's granddaughter, Taylor, who was evidently friends with Keilah and Danika, that "*one of Theron's daughters* that she [sic] was being abused by Theron over the course of several years." CP at 511 (emphasis added).

The report was referred to Chelan County Sheriff's Detective Mitch Matheson, who contacted Keilah's high school counselor. The counselor told him Keilah had not

14

mentioned abuse in the "several times" they had spoken over the "past few years." CP at 514. Keilah was not at school. The detective told Keilah's counselor that he'd like to speak to Keilah at a later date. According to his report, Keilah "did not wish to speak with me." CP at 515.

Detective Matheson next interviewed Danika, then age 13, at her middle school. She angrily disavowed the report, told him, "I want you and CPS to leave us alone," and walked out. *Id.* The detective also spoke with an employee of DSHS, who told him Janice had provided false information in the past and Theron was abiding by the voluntary services plan.

After noting that Keilah did not wish to speak with him, the detective closed the case.

### September 2009 – Keilah

Finally, in September 2009, Keilah told her probation officer that Theron had sexually abused her for years. The probation officer completed a report directed to DSHS, stating, "Keilah confirmed previous allegations made by her grandmothers, Janice Heideman and Judy Nelson that her father, Theron Heideman has been molesting her since she was the age of 7." CP at 83. Keilah described the molestation as mostly oral sex that she would perform on her father, but said Theron raped her in January 2009, and had offered her $100 for sex in March 2009. Keilah reported that Danika had once seen Theron engaged in sex with her through a bedroom window. Keilah expressed a fear to

15

her probation officer that Theron was moving on to her younger sisters.

Detective Matheson conducted a recorded interview of Keilah in which she confirmed everything in the probation officer's report. She explained that sometime before her eighth birthday, her father taught her how to perform oral sex on him and after that, "[e]very time my mom would leave, . . . he would tell me to give him a blow job and he'd go in his room and it was just that for a while." CP at 108. The molestation later progressed to digital penetration, and on New Year's Eve 2008, the sexual abuse progressed to intercourse. That night she packed her bag, ran away, and told friends what had happened. Her friends insisted she call the cops, but she "was scared to," so her friends decided to "'give [Theron] what he deserves,'" and "jumped" him early in the morning. CP at 116. According to Keilah's deposition, her friends left Theron with a head injury that required 12 stitches; Theron told hospital staff that he fell and hit his head.

During the recorded interview, Keilah expressed doubt that Danika would speak with the detective, telling him, "my dad has her terrified. She knows what he's capable [of] too." CP at 119. When the detective and Ms. Pete later interviewed Danika at school, she was a reluctant witness but eventually confirmed that once, through her father's bedroom window, she saw Theron and Keilah in what she assumed was some type of sexual act. She said that on other occasions, she had seen Keilah and Theron go into Theron's bedroom and close the door. Asked about herself, Danika said Theron had

16

"never tried anything sexual with her but indicated something else may be taking place." CP at 155. She refused to discuss it further.

In Keilah's recorded interview, she testified that, other than telling her probation officer, she had talked about her father's sexual abuse with Danika, her best friend Allie, her best friend's mom, her cousin Stephanie, and Juana. Ms. Pete was present at the recorded interview and when she asked why Keilah denied physical abuse during the investigation of Theron's assault of Ceth, Keilah answered, "I was afraid 'cause my dad—'cause, I mean, if I would have said something, he probably would have—probably would have killed me." CP at 139.

When interviewed by Detective Matheson, Keilah's cousin Stephanie reported that Keilah "first told [her] about the abuse a few years ago" and "she reported it to CPS at that time." CP at 154.

Ceth was interviewed, and reported that while he never observed any sexual abuse, "looking back on it now, I guess I can see where it may have happened. I do remember a few times when [Keilah] would go into Theron's bedroom and the door would be closed." *Id.*

Juana avoided two attempted interviews by Detective Matheson but eventually agreed to speak by telephone as long as the conversation was not recorded. According to the detective's notes, Juana said that while she didn't know who to believe about the allegations of sexual abuse, she had been aware of them for years:

17

> Ponce indicated she confronted Theron about this after hearing bits and pieces from various sources. Ponce said Theron adamantly denied doing anything inappropriate with any of the girls. Ponce admitted [Keilah] had mentioned, since about age eight, that Theron was molesting her.

CP at 156. Juana told the detective she had always had a hard time believing Keilah.

Soon thereafter, Keilah and Danika were removed from the home and Janice gained custody. DSHS entered a "founded" finding against Theron for the sexual abuse allegations. CP at 448.

At the conclusion of his investigation, Detective Matheson forwarded his report to the Chelan County Prosecuting Attorney. In January 2010, the prosecutor notified Keilah that given the absence of physical evidence and the doubts about her allegations on the part of some family members, "I am sorry that we cannot pursue this case," but "I am required to tell you that it is a situation where I don't believe we could pursue this to a conviction at this time." CP at 159.

In addition to this history, the Heideman children provided the trial court with expert testimony from Katherine Kent, a social worker who had worked for DSHS and later became a lawyer, and Susan Peters, a major crimes investigation expert. The experts expressed and explained opinions, respectively, that the State's and county's investigations were faulty in particular respects. The Heideman children also relied on deposition testimony from State and county agency employees identifying techniques that can be followed in investigating allegations of parental abuse of a child who is reluctant

18

to talk.

Having considered this and the other evidence presented by the parties, the trial court granted both the State's and the county's motions for summary judgment. The Heideman children appeal.

## ANALYSIS

The Heideman children advanced a number of theories of liability in the trial court, but on appeal they assign error and advance argument as to only the dismissal of their claims for negligent investigation.

RCW 26.44.050 requires DSHS to investigate child abuse.[4] From this statutory duty, Washington courts have found an implied cause of action for negligent investigation in certain circumstances. *M.W. v. Dep't of Soc. & Health Servs.*, 149 Wn.2d 589, 597, 70 P.3d 954 (2003). In so holding, courts rejected the argument that DSHS can only make an effort to prevent abuse and that liability for negligence should not be implied. The courts inferred, instead, a legislative intent that "tort liability will

---

[4] At all relevant times, RCW 26.44.050 provided:

Upon the receipt of a report concerning the possible occurrence of abuse or neglect, the law enforcement agency or the department of social and health services must investigate and provide the protective services section with a report in accordance with chapter 74.13 RCW, and where necessary to refer such report to the court.

Former RCW 26.44.050 (1999). In 2013, introductory language, "Except as provided in RCW 26.44.030(11)," was added. *See* RCW 26.44.050.

have a salutary effect on the seriousness with which the State executes its responsibility."
*Yonker v. Dep't of Soc. and Health Servs.*, 85 Wn. App. 71, 81, 930 P.2d 958 (1997).

The negligent investigation cause of action has been found to be available only to a parent, custodian, guardian, or child; and only when, as the result of a biased or faulty investigation, a harmful placement decision is made. *Ducote v. Dep't of Soc. & Health Servs.*, 167 Wn.2d 697, 704-05, 222 P.3d 785 (2009) (clarifying class of persons who may sue); *M.W.*, 149 Wn.2d at 591, 597-98 (limiting the injury that can be redressed to harmful placement decisions resulting from a biased or faulty investigation). A harmful placement decision is made when a child is wrongfully removed from a nonabusive home, is placed into an abusive home, or is allowed to remain in an abusive home. *Id.* (citing *Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 77-82, 1 P.3d 1148 (2000)).

"To prevail, the claimant must prove that the allegedly faulty investigation was the proximate cause of the harmful placement." *Pectu v. State*, 121 Wn. App. 36, 56, 86 P.3d 1234 (2004) (citing *M.W.*, 149 Wn.2d at 597, 601).

## I.  Claims Against the State

The Heideman children contend DSHS's investigations into reports of abuse were biased and faulty in the following respects: DSHS employees interviewed the Heideman children in the presence of their parents, they dismissed some referrals without investigation because of the source, and they failed to interview individuals that appeared

20

to have or could have relevant information.

## *Standard of Review*

We review an order for summary judgment de novo, engaging in the same inquiry as the trial court. *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). Summary judgment is proper when there is "no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." CR 56(c). All facts and inferences are construed in the light most favorable to the nonmoving party. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002).

A moving defendant may meet the initial burden of demonstrating no genuine issue of material fact by pointing out there is an absence of evidence to support the plaintiff's case. If a moving defendant makes this initial showing, then the plaintiff must set forth specific facts demonstrating a genuine issue for trial. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989), *overruled on other grounds by* 130 Wn.2d 160, 922 P.2d 59 (1996). "'The nonmoving party may not rely on speculation, argumentative assertions that unresolved factual issues remain.'" *Pectu*, 121 Wn. App. at 55 (quoting *Retired Pub. Employees Council v. Charles*, 148 Wn.2d 602, 612, 62 P.3d 470 (2003)).

"In tort actions, issues of negligence and causation are questions of fact not usually susceptible to summary judgment." *Miller v. Likins*, 109 Wn. App. 140, 144, 34 P.3d 835 (2001).

21

## A. Genuine issues of material fact exist as to whether the State conducted a biased or faulty investigation

*Interviews in the Presence of Parents*

The Heideman children provided the trial court with the declaration of Katherine Kent, a former social worker, now a lawyer, whose training and experience the State does not contest. Addressing Ms. Oyler's 2006 interview of Danika, Ms. Kent expressed the opinion that "[i]t was not reasonable under the laws, policies and procedures in effect at the time (and today) to interview the child in the presence of the alleged perpetrator." CP at 920. She opined that "[t]he social worker's interview of the child concerning possible sexual abuse allegations by her father with him present fell below the standard of care required of a prudent social worker." *Id.* The State asks us to disregard Ms. Kent's opinion because she wrongly contends former RCW 26.44.030(10) (2003) required that interviews of children for alleged abuse or neglect be conducted outside the presence of parents.

Ms. Kent's declaration might overstate statutory disapproval of conducting interviews in the presence of parents, but the State's briefing understates it. At all times relevant to this action, chapter 26.44 RCW required certain mandatory reporters to notify DSHS or the proper law enforcement agency if they had "reasonable cause to believe that a child has suffered abuse or neglect." RCW 26.44.030(1)(a). Former RCW

22

26.44.030(10) (2003)[5] provided that "[u]pon receiving reports of alleged abuse or neglect, the department or law enforcement agency may interview children." Relevant here, the provision continued:

> The interviews may be conducted on school premises, at day-care facilities, at the child's home, or at other suitable locations *outside of the presence of parents.*

(Emphasis added.) It concluded: "Parental notification of the interview must occur at the earliest possible point in the investigation that will not jeopardize the safety or protection of the child or the course of the investigation," thereby recognizing that even notification to a parent that a child is being interviewed (let alone parental participation in the interview) may jeopardize the safety or protection of the child or the course of the investigation.

The State asserts that by stating interviews "may" be conducted at identified locations outside the presence of parents, the legislature intended the presence of parents to be discretionary with the department and law enforcement. Fairly read, the statute is at least directory, even if not mandatory. "No statutory provisions are intended by the legislature to be disregarded." NORMAN J. SINGER, STATUTES AND STATUTORY

---

[5] As observed by the trial court, the provision is presently codified, in modified form, at RCW 26.44.030(14)(a)(i). Like all of RCW 26.44.030, the provision was substantially modified in 2012 and now addresses a "family assessment response" option where the allegations are of conduct that is not a criminal offense against a child victim. LAWS OF 2012, ch. 259, § 3. We rely on the law in effect at the relevant time.

CONSTRUCTION § 57:1, at 4 (6th ed. 2001). Even if directory, the statute provides

support for Ms. Kent's opinion and the Heideman children's argument that interviewing

abused children in the presence of an accused parent, or even with that parent's

knowledge, can jeopardize an investigation.

Viewed in the light most favorable to the Heideman children,[6] the evidence shows

they and their stepsiblings never revealed abuse when interviewed in the vicinity of their

parents or when interviewed as a group. The August 2007 interview of Ceth, the

subsequent interviews of R. and Danika at school, and the 2009 revelations by Keilah and

interviews of Danika and Ceth, demonstrate that private interviewing sometimes, if not

always, resulted in disclosure. There is a genuine dispute of fact over whether

interviewing the Heideman children in the presence of their parents was a faulty

interview technique.

*Dismissing Referrals Without Investigation Because of the Source*

There are many indications in DSHS records that its employees discounted the

credibility of referrals made by Janice. While the statute mandates that DSHS must

---

[6] The State fails to view the evidence in the light most favorable to the Heideman children. It argues that "when Ms. Oyler interviewed Danika . . . Theron was 'just in the house' but 'wasn't sitting right there.'" Br. of Resp't State at 34-35. Ms. Oyler's contemporaneous report states, "SW meets Theron and Danika at 72 Depot Street," and "SW questioned Danika with Theron present." CP at 270, 272. For summary judgment purposes, we consider her contemporaneous report rather than her later and potentially self-serving deposition testimony that "He wasn't sitting right there . . . I don't remember where he was exactly." CP at 605.

investigate "upon the receipt of a report concerning the possible occurrence of abuse or neglect," RCW 26.44.050, case law recognizes that whether a report is sufficient to invoke the duty to investigate "will be resolved on a case-by-case basis." *Yonker*, 85 Wn. App. at 81. The extended Heideman family had a long history with DSHS, highlighting another difficulty in investigating child abuse: it happens in dysfunctional families, and reports, if received, may come from distrusted family members. A jury might find that DSHS employees reasonably discounted Janice's reports, even though she passed along information that was later determined to be founded.

On the other hand, when deposed, DSHS investigator Pete was asked about her impression of Janice after meeting her, and answered, "She's a caring grandma that cares about her children . . . [h]er grandchildren." CP at 655. When told in August 2007 that he could not stay with his grandmother following his father's assault because of a protective order obtained by his father, Ceth told officers that the restraining order was "'bogus,' and that his father had put it in place unfairly." CP at 329. And ultimately, of course, the three Heideman children were removed from their father and stepmother's home and were placed with Janice. There is a genuine dispute whether DSHS reasonably or unreasonably declined to investigate some of the information reported by Janice.

*Failure to Interview Individuals that Appeared to Have or
Could Have Relevant Information.*

The few collateral sources who contacted DSHS or were contacted by DSHS

tended to indicate there was ongoing abuse. School counselor Jim Bowen told a DSHS investigator in 2004 that Keilah talked to him about being struck by Juana with a paddle, consistent with Janice's November 2004 report. When a neighbor was contacted in August 2007, she told a DSHS investigator and deputy sheriff that she had witnessed physical abuse of Ceth on a number of occasions. She revealed that the neighbors were afraid of Theron.

The record on appeal contains no evidence that DSHS or law enforcement ever interviewed Rosalie Edwards, whose phone number was provided to DSHS by Janice; or Ms. Edwards's neighbor in June 2007 who claimed to have spoken to Danika and whose name was evidently provided (it is redacted in DSHS's records); or the mother of Keilah's friend who identified herself in making the report in June 2007, or her daughter (the name is redacted in DSHS's records). There is no evidence DSHS interviewed Keilah's cousin Stephanie, who claims to have notified DSHS of Theron's sexual abuse of Keilah in or about 2007, nor did DSHS employees ordinarily interview children in the household other than the reported victims. DSHS investigations usually ended as soon as the alleged victim either denied abuse or refused to be interviewed.

In *Yonker*, the appellate court reversed a trial court's summary judgment dismissal of a claim that DSHS negligently refused to investigate a mother's report that her three-year-old son made a statement suggesting sexual abuse by his father. DSHS declined to investigate because the child would not repeat the allegation to DSHS workers. The

26

child's father later turned himself in to law enforcement, confessing that he molested his son. *Yonker*, 85 Wn. App. at 74.

The *Yonker* court noted the State owes a duty to investigate in cases where abuse is suspected, and "[n]othing . . . implies that the State's duty to investigate arises only when it has a report of actual abuse." *Id.* at 80 ("the relevant statute specifically requires investigation 'of a report concerning *the possible occurrence of abuse*'" (quoting RCW 26.44.050)). The court further noted that, "[i]f there is a question whether a report is sufficient to invoke the duty to investigate, that issue will be resolved on a case-by-case basis." *Id.* at 81. The Heideman children's expert, Ms. Kent, testified by declaration that based on her training as a social worker, 10 years' experience working for DSHS, and subsequent training and work as a lawyer specializing in family law, the number of referrals in this case was a "red flag" when weighing the risk factors for assessing imminent risk of harm to children. CP at 918. The Heideman children presented evidence of a number of avenues of investigation that were not pursued. Again, the issue of negligence is a question of fact that is not usually susceptible to summary judgment. *Miller*, 109 Wn. App. at 144. On this contested record, for the trial court to dispose of the Heideman children's claim against the State usurped the role of the jury.

> B. Genuine issues of material fact exist as to whether the State's investigation proximately caused a harmful placement

DSHS argues that even if it conducted a negligent investigation, it was not the

27

cause of the Heideman children's alleged harmful placement. To prevail, a claimant must prove that the allegedly faulty investigation was the proximate cause of the harmful placement decision. *Pectu*, 121 Wn. App. at 56.

Proximate cause includes two elements: cause in fact and legal causation. *Id.* Cause in fact is generally a jury question and "'refers to the actual, 'but for,' cause of the injury, i.e., 'but for' the defendant's actions [would the] plaintiff . . . be injured.'" *Tyner*, 141 Wn.2d at 82 (alterations in original) (quoting *Schooley v. Pinch's Deli Market, Inc.*, 134 Wn.2d 468, 478, 951 P.2d 749 (1998)). Cause in fact can be determined by the court only if "reasonable minds could not differ." *Taylor v. Bell*, 185 Wn. App. 270, 287, 340 P.3d 951 (2014), *review denied*, 183 Wn.2d 1012, 352 P.3d 188 (2015).

Legal causation is an inquiry dependent on "'mixed considerations of logic, common sense, justice, policy, and precedent,'" and considers "whether, as a matter of policy, the connection between the ultimate result and the act of the defendant is too remote or insubstantial to impose liability." *Tyner*, 141 Wn.2d at 82 (internal quotation marks omitted) (quoting *Schooley*, 134 Wn.2d at 478-79). Legal causation is a question of law. *Bell*, 185 Wn. App. at 287.

DSHS argues it has demonstrated lack of causation as a matter of law by demonstrating there was nothing it could have done differently to get the Heideman children to reveal the abuse. It points to the depositions of Ceth and Keilah. When Ceth was asked in deposition whether there was anything social workers could have done to

28

make him feel comfortable enough to report abuse prior to August 2007, he responded, "No, no, I told my principal once about it and that was the biggest mistake I ever made in my entire life." CP at 476. When Keilah was asked whether there was anything Ms. Pete could have done to make her feel comfortable enough to disclose the abuse, she said, "Maybe if she told me beforehand that I wouldn't—he wouldn't be able to touch me if I said anything." CP at 746.

The testimony from Ceth and Keilah is relevant, but it does not resolve the issue of causation as a matter of law. First, Ceth and Keilah are not the only witnesses and arguably not the best witnesses on what might have made a child in their former situation more comfortable speaking with agency employees. They know how frightened they were. But there is no foundation that either knew anything about child psychology or methods or strategies for how a questioner might get through to an abused child. Ultimately both of them *did* talk, as did R. and Danika.

Second, there were seven children in the Heideman/Ponce household. For the abuse to be discovered, not all of them needed to talk.

Third, DSHS could pursue third parties as sources of information. They had received multiple reports and been provided with names, addresses, and telephone numbers of possible witnesses.

Viewing the evidence in a light most favorable to the Heideman children, a jury could find that DSHS's faulty investigation was a proximate cause of the failure to

29

remove them from the Heideman/Ponce home.

## II. Claims Against the County

### A. The only genuine issue of material fact as to whether the county conducted a biased or faulty investigation arises from Detective Harnett's refusal to participate in the August 2006 investigation

The Heideman children contend that Detective Harnett was negligent in 2006 when he declined to investigate allegations of sexual abuse, and that Detective Matheson was negligent in 2008 when he left an investigation into alleged sexual abuse incomplete. The county argues RCW 26.44.030 limits its duty to reporting suspected child abuse to DSHS, and reporting child abuse or neglect to the prosecutor. This argument was rejected in *Rodriguez v. Perez*, 99 Wn. App. 439, 448, 994 P.2d 874 (2000), *aff'd sub nom. Roberson v. Perez*, 156 Wn.2d 33, 123 P.3d 844 (2005), in which the court concluded RCW 26.44.050 does not limit law enforcement's response "to certain specified acts or time periods, but provides a general mandatory duty to investigate."

The Heideman children presented evidence creating a jury question whether the sheriff's office conducted a negligent investigation when Detective Harnett dismissed the report of abuse in 2006 out of hand. In refusing to participate in the 2006 investigation, the detective told Ms. Oyler, "Danika has been interviewed multiple times" and "there is nothing new to investigate." CP at 269. We find nothing in the record on appeal indicating Danika was ever interviewed before August 2006, let alone multiple times. We recognize the record on appeal may be incomplete, but it is necessarily the basis for

30

our decision.

But the Heideman children are unable to present any reasonable argument why Detective Matheson should or could reasonably have pursued Janice's 2008 report to the Wenatchee Police Department further than he did. When interviewed, Danika vehemently denied the abuse reported, telling him to "[t]ell my lying grandmother to leave us alone and stop making up crap about my dad." CP at 278. He spoke with Keilah's school counselor and attempted, without success, to speak with Keilah. He spoke to a DSHS employee who told him Theron "appears to be trying and is following through with all the requirements placed on him by CPS," and Janice "has made up accusations in the past in an attempt to get her grand[children] away from their father." *Id.* While RCW 26.44.050 gives rise to a duty of reasonable investigation, it does not give rise to a duty to prevent every case of child abuse. *Yonker*, 85 Wn. App. at 81.

> B. As a matter of law, Detective Harnett's refusal to participate in the August 2006 investigation did not proximately cause a harmful placement

We agree with the county that even if Detective Harnett's August 2006 refusal to investigate was negligent, the Heideman children present no genuine issue of fact that the county's negligence resulted in a harmful placement. The 2006 report was of Theron's alleged sexual abuse of Danika. Danika denies ever having been sexually abused by her

31

father.[7]

The Heideman children nonetheless contend that had a proper investigation been conducted, Danika might have disclosed that while she herself was not being sexually abused, she had seen her sister being sexually abused. The argument is at best speculative and at worst, contrary to the evidence. Danika testified she saw her father lying on top of Keilah in the summer when Danika was between the sixth and seventh grade. In August 2006, Danika was 11 years old—presumably on the verge of her sixth-grade year, not her seventh. Viewing the evidence in the light most favorable to the Heideman children, they have not demonstrated that but for Detective Harnett's declination of DSHS's invitation to participate in its interview of Danika, the child abuse would have been discovered. Summary judgment was appropriate.

We affirm the trial court's order dismissing the Heideman children's claims against the county. We affirm its order on the State's summary judgment motion insofar as it dismissed the children's claims other than negligent misrepresentation. We reverse its dismissal of the negligent misrepresentation claim against the State and remand for proceedings consistent with this opinion.

---

[7] The fact that Danika had no sexual abuse to report in 2006 does not eliminate Ms. Oyler's interview as an issue for the State. The Heideman children and their expert can still make the argument that by introducing the children to the child abuse investigation process as one in which parent and child are interviewed together, there was a chilling effect on the children's willingness to speak thereafter.

32

No. 33093-1-III
*Heideman v. Chelan County*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

I CONCUR:

_____
Lawrence-Berrey, A.C.J.

33093-1-III

KORSMO, J. (dissenting in part) — Although appellants suggest other ways in which Child Protective Services (CPS) could have conducted its long-running investigation of the Heideman family, they have not established that a negligent investigation occurred. Through their own actions the appellants also consistently frustrated CPS efforts to investigate the family, even when the children were interviewed alone as they now insist should have been done. CPS had no case at any time that would have supported a dependency action. Because appellants present nothing other than self-serving speculation that things would have been different, I would affirm the summary judgment as to all defendants.

As the majority notes, the statutory tort at issue here is a narrow one requiring the plaintiffs to establish (per their theory) that if CPS had used different interview techniques, the children would not have remained in an allegedly abusive household. Their speculative claims fail for at least two reasons.

First, the interview statute did not impose any obligation on CPS to interview suspected child abuse victims apart from their parents, even when a parent is the suspected abuser. It permitted, and probably suggested, that interviews take place away

from the suspected abuser. However, it did not require that practice, nor any other specific approach to conducting interviews.

> Upon receiving reports of alleged abuse or neglect, the department or law enforcement agency *may* interview children. The interviews may be conducted on school premises, at day-care facilities, at the child's home, or at other suitable locations outside of the presence of parents. Parental notification of the interview *must* occur at the earliest possible point in the investigation that will not jeopardize the safety or protection of the child or the course of the investigation. Prior to commencing the interview the department or law enforcement agency shall determine whether the child wishes a third party to be present for the interview and, if so, shall make reasonable efforts to accommodate the child's wishes. Unless the child objects, the department or law enforcement agency shall make reasonable efforts to include a third party in any interview so long as the presence of the third party will not jeopardize the course of the investigation.

Former RCW 26.44.030(10) (2006) (emphasis added). This statute authorized, but did not require, interviews of children. The only things it mandated were that the parents be notified if children were interviewed and the children be asked if they wanted a third party present.

Simply put, this statute imposes no duty to investigate in a particular manner. It certainly does not impose an obligation to interview children without notifying their parents as soon as possible thereafter.[1] At the end of the day, the children knew that CPS would have to report to the parents the fact that the children had talked to CPS. There

---

[1] The statute also does not define "presence," let alone do so in a manner that requires the interview to take place on different premises than where the parent, who soon will have to be told about the interview, is located.

2

being no duty to interview the children in any other manner, the CPS investigators were not negligent.

The additional problem with this case is that all of the plaintiffs were interviewed apart from the parents on numerous occasions and either (a) repeatedly denied that any abuse occurred or (b) retracted allegations of abuse shortly after making them. Thus, the actual evidence in this case totally belies the speculation of plaintiffs' expert that the children might have responded differently to other interview techniques. In fact, they did not respond to *any* interview techniques. The children were cowed by their parents long before any investigation and had learned to treat CPS and others outside the family as adversaries rather than potential allies. Theron Heideman bears responsibility for that—not CPS or Chelan County or any other governmental entity. It is rankest speculation that things would have turned out differently if investigators had used other interview techniques.

The trial court properly granted summary judgment. The appellants did not establish that CPS acted negligently within the meaning of this statutory tort. They also did not even establish that their proposed interview techniques would have resulted in sufficient (and non-retracted) disclosures that would have allowed CPS to initiate dependency actions. Indeed, their actual behavior proved the contrary position. Their current speculation did not satisfy their burden of proof and their past behavior disproved their case.

3

No. 33093-1-III
*Heideman v. Chelan County*

We should affirm both dismissals.  Accordingly, I respectfully dissent in part.

_____
Korsmo, J.

4